IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AMBER K. JONES,<br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | Case No. 19–CV–00793–JPG |

## **MEMORANDUM OPINION AND ORDER**

This is a Social Security disability appeal. Before the Court is Plaintiff Amber K. Jones's Social Security Brief. (ECF No. 18). Defendant Commissioner of Social Security responded. (ECF No. 25). For the reasons below, the Court **AFFIRMS** the Commissioner's benefits decision.

**I.    PROCEDURAL & FACTUAL HISTORY**

From 2012 to 2014, Jones (now 36) worked as a certified nursing assistant at different nursing homes, where she cared for patients. (Work History Report 5, ECF No. 14-6; Hearing Tr. 6, ECF No. 14-2).

"[T]owards the end," she switched to only working part-time due to back pain. (Hearing Tr. at 8). Indeed, emergency department records confirm that in January 2014, Jones presented with pain after falling the night before and "hitting [her] lower back on steps." (Good Samaritan Records at 14, ECF No. 14-10). She described it "as stabbing and shooting . . . at a severity level of 7/10." (*Id.*). And the doctor noted that Jones suffered from sciatica[1] and had several risk factors: "obesity, lack of exercise, sedentary lifestyle, and prior disk injury." (*Id.*).

---

[1] Sciatica is "a syndrome characterized by pain radiating from the back to the buttock and along the posterior or lateral aspect of the lower limb . . . . The term is also used to refer to pain anywhere along the course of the sciatic nerve." *Sciatica*, Dorland's Medical Dictionary (33d ed. 2020).

Four months later, Jones returned to the emergency room complaining of "left low back pain that is shooting down her left leg." (*Id.* at 13). The nurse noted, however, "Patient is sitting in waiting room talking on cell phone & appears to be in no pain or discomfort at this time." (*Id.*). She was discharged with instructions to use ice and take an over-the-counter pain reliever. (*Id.*).

Jones stopped working shortly after the second emergency-room visit: "My back was really bad. I was in pain every day. . . . I couldn't, my body couldn't handle it." (Hearing Tr. at 6; Work History Report at 5). For the next year and a half, Jones was "just basically . . . sitting at home with elderly people. That's about it, that and *house set*. I didn't do it [e]very day. I worked for this lady. If she had to go to the store, I set with her husband and things like that. . . . It was like an hour here and there." (Hearting Tr. at 22) (emphasis added). Besides that, Jones was living with her mom (and sometimes her boyfriend), driving, reading, watching television, and doing word-search puzzles. (*Id.* at 22–23).

Eventually, in February 2016, Jones saw a new physician. (Physician Rural Health Records at 18, ECF No. 14-8). Jones again presented with "low back pain" from "a back injury a long time ago while working at a nursing home." (*Id.*). She described the pain as "10/10 most times. Feels worse in the mornings." (*Id.*). That said, the doctor noted that Jones's general appearance was "[w]ell developed" and "[i]n no acute distress." (*Id.* at 19). Even so, the doctor ordered an MRI that revealed the following:

> 1) Multilevel degenerative disc disease with disc intrusion most prominent to the left of midline at L4-5;
>
> 2) L5-S1 right paracentral and foraminal disc extrusion; and
>
> 3) Multilevel fact arthropathy is also noted with milder disc bulge at L3-4.

(*Id.* at 21). He referred Jones to a specialist, (Hearing Tr. at 11), who diagnosed her with "Lumbar disc herniation with radiculopathy" and "recommend[ed] open L3-4-5-S1 discectomies," (Physician Rural Health Records at 29).

Jones underwent back-to-back surgeries in March 2016, but her situation hardly improved. (Hearing Tr. at 11). Jones testified that she thought she "was supposed to just spend the night in the hospital and get up the next day and go home." (*Id.* at 12). Instead, she "was in the hospital for at least a month if not longer": "I woke up and I couldn't walk. . . . They tried to stand me up and I couldn't stand or feel my legs." (*Id.* at 11–12). She said it took her eight-to-nine months to relearn to walk, and her balancing issues persist even today. (*Id.*) ("Like I can't stand for five minutes without having to hold on. I feel like I'm going to lose balance and fall."). Jones also said she still uses a cane "[s]ometimes on days" when she is "hurt[ing] a lot and . . . having a lot of issues." (*Id.* at 12, 14) ("Sometimes if I touch the bottom [of my feet], I can't really feel it."). And her pain continues: "Sometimes I notice it's worse when it rains or is cold outside, it's worse with pain too. Some days, it's bad and some days I have rough nights." (*Id.* at 12–13). She spends most days at home now: "I try to move around and do just some house things. Even things like that, if it requires a lot of standing and bending, it bothers me by the end of the day, I'm in a lot of pain." (*Id.* at 13).

In April 2016, Jones applied for disability insurance and Social Security Income benefits with the Social Security Administration. (Decision 1, ECF No. 14-2). She alleged "disability beginning September 2014." (*Id.*). "The claim was denied initially . . . and upon reconsideration . . . ." (*Id.*). When Jones "filed a written request," an administrative-law judge ("ALJ") "held a video hearing." (*Id.*). Jones was represented by an attorney. (*Id.*). The ALJ then applied the five-step analysis used to determine whether an applicant is disabled, 20 C.F.R. § 404.1520(a), and concluded that Jones is not disabled, (Decision at 2).

At Step 1, the ALJ determined that Jones has not engaged in substantial gainful activity since her alleged onset date in September 2014. (*Id.*).

At Step 2, the ALJ evaluated Jones's conditions and concluded that she is suffering from the following severe impairments that limit her "ability to perform basic activities": "lumbar spine degenerative disc disease, obesity, and type II diabetes mellitus." (*Id.* at 3). That said, the ALJ noted that "[t]here is no objective medical evidence to suggest that [Jones's] hypertension more than minimally affects [her] ability to perform basic work functions" because "she testified that a diuretic and Lisinopril managed her hypertension." (*Id.*).

At Step 3, the ALJ determined that Jones's impairments, though severe, do not meet the statutory listing for presumptive disability. (*Id.* at 4).

Before moving to Step 4, the ALJ assessed Jones's residual functional capacity and concluded that she can still work:

> [Jones] has the residual functional capacity to perform sedentary work . . . except lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, sit for at least 6 of 8 hours, and stand and/or walk for about 2 out of 8 hours. She can occasionally use the bilateral lower extremities for pushing and/or pulling. She should never climb ladders, ropes, or scaffolding but can occasionally climb ramps and stairs, kneel, crouch, crawl, and balance. She should avoid concentrated exposure to dangerous workplace hazards such as exposed moving machinery and unprotected heights, and vibration.

(*Id.* at 5).

In reaching that conclusion, the ALJ started by noting Jones's medical history:

> At the hearing, [Jones] testified she lost about 100 pounds and weighed 231 pounds. In 2014, she stopped working as a [certified nursing assistant] due to back pain. She reduced her work and performed some work activity prior to her back surgery in March 2016. She underwent two back surgeries in one week in March 2016, had bilateral foot drop surgery, and was hospitalized for a month. She did not walk for almost 8 months and progressed to a cane within 9 months. She still had balance problems, and used a cane on bad days a couple times a week and when she was out doing more walking. She had trouble standing, bending, and sitting more than an hour. Her numbness and tingling of her feet were worse on the left side. She could not stand on her toes. She had back pain daily and she lay down about 3–4 hours a day. She was prescribed Norco that she took a couple times a week but she tried to avoid pain medications.

(*Id.* at 5–6).

Then, the ALJ found that Jones's statements about "the intensity, persistence and limiting effects of [her severe impairments] are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 6).

> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent[.] [H]er subjective allegations are greater than expected in light of the objective clinical evidence and treatment notes. The claimant alleged an onset date of September 1, 2014. She testified she continued to perform some work activity after this date and did not have surgery until March 2016. She did complain of some back pain in 2014 with mild findings in imaging studies. It was not until March 2016 when she complained of significant back pain and leg symptoms present for 2–3 months. She did have some complications after March 2016 surgery with incision revision and some lower extremity weakness and foot drop. However, the records noted she was ambulating independently much sooner than 8–9 months as alleged and was able to go to Holiday World by June 2016. She only attended 7 of 19 approved physical therapy visits and had no follow-up visit with the neurosurgeon after June 2016. She had no additional therapy, injections, or any follow-up with any specialists. There were no significant complaints of back pain in 2017 treating visits with normal musculoskeletal neurological examinations. [Jones] made some brief complaints of back pain after a fall in 2017 but subsequent physical examinations were normal.

(*Id.*).

For the next six pages of the Decision, the ALJ discussed the reasons for discrediting Jones's subjective complaints. (*Id.* at 6–12). These were some of his findings:

- "There is no evidence that a cane is medically necessary or any evidence of balance problems after she had some recovery after surgery." (*Id.* at 6).

- "Her post-surgery foot drop clearly improved, she indicated surgery was beneficial, and physical examination support her lumbar surgery was successful and she does not need an assistance device for ambulation." (*Id.*).

- In March 2016, Jones "indicated she was much better after surgery, used a walker when she left her home, and ambulated independently at home. [She] canceled physical therapy four times from May 20, 2016 through May 27, 2016 with reasons that she did a lot over a weekend, did not have transportation, rain, and weather. She did not show for the June 3, 2016 appointment. On June 6, 2016, [Jones] said she was feeling good, had been swimming, and reported some muscle soreness after therapy." (*Id.* at 8).

- Jones "presented with a cane at physical therapy through June 10, 2016. On June 13, 2016, she advised her physical therapist that she went to Holiday World over the weekend, was in the wave pool, and the activity improved her balance. [Jones] reported her pain was zero and she was able to tolerate ambulation well walking 170 feet without an assistive device. . . . She canceled five physical therapy appointments through June 29, 2016. On July 12, 2016, the physical therapy progress report noted [she] attended 7 of 19 scheduled appointments from May 2016 through July 1, 2016 . . . ." (*Id.*).

- "The physical examinations and lack of any follow-ups with orthopedics or neurosurgeon since June 2016 are inconsistent with the claimant's alleged pain limitations." (*Id.* at 9).

- "[T]he record supports that the surgery was effective in improving her symptoms based on [Jones's] own reports, physical therapy records, review of systems, and physical examinations after surgery." (*Id.* at 10).

- Jones's "uncontrolled diabetes was attributed to steroid use after surgery. . . . [T]here is no evidence of any other treatment for diabetes or any other conditions since March 2017." (*Id.*).

- "Although [Jones] has described daily activities, which are limited, two factors weigh against considering these allegations to be strong evidence in favor of finding [her] disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Second, even if [Jones's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [her] medical condition, in light of the limited objective findings after she recovered from surgery." (*Id.*).

The ALJ then weighed the opinion evidence. The State agency medical consultant stated that Jones "could perform light work with occasional postural activity except frequent balance and never climb ladders, ropes, or scaffolding." The ALJ gave "greater weight" to this opinion: "The additional lower extremity, hazard, and vibration limitations of the residual functional capacity are reasonable given [Jones's] back pain, lower extremity symptoms, and reported occasional use of pain medications." (*Id.* at 11).

Next, Jones's surgeon suggested in March 2016 that her "low back pain and left foot drop limited [her] to sitting less than 2 hours in an eight-hour day and standing and/or walking less than 2 hours." (*Id.*). The ALJ only gave that opinion "some weight" because "[t]he record supported [Jones] progressively improved and these less than sedentary limitations shortly after surgery did not persist for 12 months." (*Id.*).

For all that, the ALJ concluded, "the objective evidence does not demonstrate the existence of limitations of such severity as to have precluded the claimant from performing sedentary work on a regular and continuing basis at any time from the alleged onset date of disability for a period of 12 months." (*Id.*).

At Step 4, the ALJ adopted the opinion of a vocational expert, who "testified the demands of [Jones's] past relevant work exceed [her] sedentary residual functional capacity." (*Id.* at 12).

Finally, at Step 5, the ALJ referred again to the vocational expert's testimony and asserted that Jones could still work as (1) a "[d]ocument preparer such as DOT 249.587-018, with 46,000 jobs nationally"; (2) an "[a]ssembler such as DOT 706.684-030, with 25,000 jobs nationally"; or (3) an "[i]nspector such as DOT 739.687-182, with 5,000 jobs nationally." (*Id.*). For that reason, the ALJ concluded that Jones "has not been under a disability, as defined in the Social Security Act, from September 1, 2014, through" July 13, 2018. (*Id.* at 13–14).

Jones appealed the decision to the Appeals Council, but it denied review. (Compl. 3, ECF No. 1). So in July 2019, Jones filed a Complaint in this Court seeking judicial review under 42 U.S.C. § 405(g). (*Id.* at 1). She raises three arguments:

1. "[T]he ALJ erred in evaluating her subjective symptoms";

2. "[T]he ALJ erred in evaluating the opinion evidence and created an evidentiary gap"; and

3. "[T]he ALJ's Step Five determination is [not] supported by substantial evidence."

(Jones's Brief at 6).

## II.     LAW & ANALYSIS

The Court does not doubt that Jones's ailments are real and serious. The task here, however, is to determine whether the ALJ built an accurate and logical bridge from the evidence to his conclusion that Jones is not disabled. He did. And although the vocational expert's testimony was lacking in several respects, Jones forfeited any objection by waiting to raise the discrepancies only after the hearing. This Court must therefore defer to the ALJ and affirm.

### A. Legal Standard

In reviewing the Social Security Administration's benefits decisions, the Court treats its findings as conclusive "so long as they are supported by 'substantial evidence.' " *Beistek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (citing 42 U.S.C. § 405(g)). A decision is supported by substantial evidence if it contains sufficient evidence to support its factual determinations. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Put differently, *substantial evidence* means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This is a very deferential standard of review. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "It is the responsibility of the ALJ, not the reviewing court, to resolve conflicting evidence and to make credibility determinations." *Brewer v. Chater*, 103 F.3d 1384 (7th Cir. 1997). The Court must only determine "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).

### B. The Subjective Complaints

An ALJ examines the entire case record when considering the intensity, persistence, and limiting effects of an individual's symptoms. SSR 16–3P, 2016 WL 1119029, at *4 (Mar. 16, 2016). This includes the objective medical evidence, the individual's statements, information provided by medical sources and other persons, and any other relevant information in the individual's case record. *Id.* But not every source is relevant in every case; an ALJ need only discuss those that are "pertinent to the evidence of record." *Id.* An ALJ may also consider the frequency of the individual's complaints, the frequency of the individual's attempts to receive treatment, and, if the individual did not seek treatment, then why not. *Id.* Ultimately, "[t]he

determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* An ALJ's failure to adequately explain a credibility finding by discussing specific reasons supported by the record is therefore grounds for reversal. *Terry v. Astrue*, 380 F.3d 471, 477 (7th Cir. 2009). That said, the Court will only overturn an ALJ's credibility finding if it is patently wrong. *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018). *Cf. Minnick v. Colvin*, 775 F.3d 929, 936–37 (7th Cir. 2015) (finding that an ALJ erred in assessing the individual's credibility by using boilerplate language and not meaningfully reviewing the evidence).

Jones points to the Seventh Circuit's decision *Beardsley v. Colvin* for the proposition that an ALJ cannot "ignore applicants' claims of severe pain simply because such subjective states are impossible to verify with complete certainty . . . ." 758 F.3d 834, 837 (7th Cir. 2014). She therefore argues that the ALJ erred by discounting her subjective complaints because "they could not be objectively verified." (Jones's Brief at 7). The Court disagrees.

First, the "main reason" that the ALJ in *Beardsley* "discount[ed] the evidence of [the claimant's] physical limitations was the care she provided for her mother." (*Id.* at 838). The Seventh Circuit noted that although "it is proper for the Social Security Administration to consider a claimant's daily activities in judging disability," it must still exercise "caution in equating these activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member." (*Id.*). Along those lines, the ALJ in *Beardsley* erred by assuming that the claimant was fit to work merely because she managed to clean, do laundry, and shop each week: The claimant testified that "it took her several days to complete each chore," and that shopping for just a half-hour "often left her knew in worse pain the next day." (*Id.*).

The same cannot be said here. True, the ALJ here noted that Jones "drove, shopped at Walmart, and before surgery, her mother helped with shopping." (Decision at 6). But he did not stop there. Instead, the ALJ gave several other reasons why Jones's subjective complaints contradicted her own statements and the objective medical evidence. For example, he recalled that Jones "only attended 7 of 19 approved physical therapy visits and had no follow-up visit with the neurosurgeon after June 2016." (Decision at 6). Jones now argues that the therapy notes suggest that she "had to sit secondary to fatigue." (Jones's Brief at 9). That much is true; but those same notes—made mere months after Jones's surgery—also state that Jones "report[ed] no back pain" and "less numbness and tingling in her left leg." (Good Samaritan Records 90–91). At another therapy session three days later, Jones again reported that she was "not having any pain" and that "she went to Holiday World over the[] weekend and she got in the wavepool and states she thinks that has helped with her balance." (*Id.* at 88). Yet despite the apparent progress she was making, Jones stopped going to therapy. And when the ALJ asked Jones why she only went to seven-of-nineteen sessions, she simply replied, "I thought I went for more than that." (Hearing Tr. at 20). Moreover, although Jones asserts that "[t]he ALJ never acknowledged her testimony explaining the experience at Holiday World," (Jones's Brief at 9), that is incorrect: The ALJ noted specifically that "the trip was not enjoyable," (Decision at 6). At any rate, the ALJ found it significant that Jones could even *go* to Holiday World given her supposed discomfort. (*See id.*). These, of course, were just a few reasons why the ALJ discounted Jones's subjective complaints.

More importantly, the ALJ's assessment was not merely based on a *lack* of medical evidence to support Jones's complaints. Indeed, the ALJ noted that Jones's "post-surgery foot dop clearly improved, she indicated surgery was beneficial, and physical examination support her lumbar surgery was successful and she does not need an assistive device for ambulation."

(Decision at 6). He then pointed to specific evidence in the record to support his conclusion that "the surgery was effective in improving [Jones's] symptoms based on [her] own reports, physical therapy records, review of systems, and physical examinations after surgery." (*Id.* at 10).

All in all, Jones disagrees with the ALJ's assessment and asks the Court to reweigh the evidence. But because the ALJ clearly articulated specific reasons for discounting Jones's subjective complaints, and those reasons are not patently wrong, this Court must show deference.

### C.  The Medical Opinions

An ALJ may order a consultative examiner to analyze an individual "when the record as a whole is insufficient to support a determination . . . ." 20 C.F.R. § 416.919a(b). Because medical records often provide little guidance about whether an individual can work, consultants' familiarity with the administrative process can prove helpful "to secure needed medical evidence." *Id.* "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record . . . ." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

On top of challenging the ALJ's reasons for discrediting her subjective complaints, Jones asserts that the ALJ gave improper weight to the opinion of the State agency medical consultant. She argues that the ALJ's conclusion that she could still perform *sedentary* work undermines the consultant's opinion that Jones could perform *light* work—yet the ALJ still gave the consultant's opinion "greater weight." Even so, Jones fails to show how this "error" was prejudicial. The Seventh Circuit rejected a similar argument in *Palmer v. Saul*: Because the ALJ's "findings were more restrictive than the conclusions of those non-examining experts," the claimant failed to show "how a more restrictive [assessment] could have negatively affected his claim." 779 Fed. App'x 394, 398 (7th Cir. 2019). Indeed, the ALJ's conclusion that Jones is not disabled would have been

*strengthened* had he given more weight to the opinion of the State agency medical consultant. This argument therefore lacks merit.

Similarly, an ALJ must give a treating physician's opinion controlling weight when the opinion is (1) supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent" with substantial evidence on the record. 20 C.F.R. § 404.1527(d)(2). "If the opinion is unsupported or inconsistent with the record, the ALJ may still choose to accept it, but if the ALJ rejects the opinion, he must give a good reason." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). But "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 772, 728 (7th Cir. 2018). And "[a]s a general rule, reviewing courts will not interfere with the Commissioner's resolution of conflicting evidence." 2 Harvey L. McCormick, Social Security Claims and Procedure § 14:9 (6th ed. 2019).

The Seventh Circuit has repeatedly affirmed ALJ decisions to discount the opinions of treating physicians when the ALJ "minimally articulate[d] his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). In *Skarbek v. Barnhart*, for example, the court found that the ALJ's decision to give little weight to the claimant's treating physician was supported by substantial evidence, pointing to inconsistencies between the opinion and objective medical evidence, like X-rays. 390 F.3d 500, 504–504 (7th Cir. 2004). The court in *Ketelboeter v. Astrue* also upheld the ALJ's decision to discount the opinion of the claimant's treating physician because physical and objective evidence on the record failed to corroborate the claimant's subjective complaints. 550 F.3d 620, 625 (7th Cir. 2008).

Jones claims that the ALJ erred by only giving her treating physician's opinion "some weight" because Jones apparently improved since 2016, when the opinion was made. She argues

that a note from her last therapy session confirmed that her left leg was "weaker than [the] right," and that she was still "at risk for falls." (Good Samaritan Records at 84). But that note was from June 2016; and the ALJ *did* give the physician's opinion "[s]ome favorable weight because [Jones] was recovering from surgery, recently started physical therapy, and there is no evidence that these limitations were permanent." (Decision at 12). After June 2016, however, the ALJ only gave the opinion "little weight" because "[t]he record supports [Jones] progressively improved and these less than sedentary limitations shortly after surgery did not persist for 12 months." (*Id.*). The only evidence that Jones presents to rebut that conclusion is the June 2016 therapy note, even though the ALJ pointed to "several 2017 treating visits" when Jones "denied any back pain . . . and the musculoskeletal and neurological examinations were normal." (Decision at 9). The ALJ therefore gave due weight to the treating physician's opinion because it seemingly contradicted substantial evidence on the record. With that, the Court will again defer to the ALJ.

### D. The Vocational Expert

"ALJs often seek the view of 'vocational experts' " in determining "the types of jobs [a claimant] could perform notwithstanding his disabilities" and "whether those kinds of jobs 'exist in significant numbers in the national economy." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (citing 20 CFR §§ 404.160(c)(1), 416.960(c)(1), 404.1566(e)). "When offering testimony, the experts may invoke not only publicly available sources but also 'information obtained directly from employers' and data otherwise developed from their own 'experience in job placement or career counseling.' " *Id.* at 1152–53 (quoting SSR 00-4p, 2000 WL 1898704, at *3). "A finding based on unreliable [vocational expert] testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008).

This is "the only step for which the Administration bears the burden of proof." *Krell v. Saul*, 931 F.3d 582, 584 (7th Cir. 2019).

> Vocational experts often rely on the Dictionary of Occupational Titles [("DOT")], a database of job titles that has not been updated in almost 30 years. The database does not list the number of jobs associated with each job title, so the vocational expert must perform an estimate. Because the database of job titles is so outdated, an expert's methodology for connecting job titles to reliable estimates of the number of jobs for each title is especially important. The Social Security Administration has itself acknowledged this issue and expressed an intent to update the database, but the new version has not yet arrived.

*Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

In *Biestek*, the Supreme Court considered whether an ALJ erred by not inquiring into the accuracy of a vocational expert's testimony. *Id.* at 1152–58. The expert testified that the claimant could still work "sedentary jobs 'such as a bench assembler [or] sorter' that did not require many skills. And she further testified that 240,000 bench assembler jobs and 120,000 sorter jobs existed in the national economy." *Id.* at 1153. Even at the behest of the claimant's lawyer, however, the ALJ refused to require the vocational expert "to produce the files in any form." *Id.* On appeal, the Supreme Court refused to adopt a categorical rule that requires reversal whenever "a vocational expert refuses a request for underlying data." *Id.* at 1153. Instead, it held that whether an ALJ erred by not delving deeper into a vocational expert's testimony is a case-by-case inquiry that requires the reviewing court to "take[] into account all features of the vocational expert's testimony, as well as the rest of the administrative record. And in doing so, it defers to the presiding ALJ, who has seen the hearing up close." *Id.* at 1156.

Jones argues that the ALJ erred by not investigating the truth of the vocational expert's testimony about the types of jobs that she could still work.[2] For one, Jones contends that the position "document preparer" no longer exists in today's digital world. According to the DOT, document preparers "prepare[] documents, such as brochures, pamphlets, and catalogs, **for microfilming** . . . ." DOT § 249.587-018 (emphasis added).[3] Judge Brown of the Eastern District of New York recently noted that "reported cases considering expert opinions as to the number of microfilm document preparers in the national economy—opinions which are almost universally adopted by the assigned ALJs—demonstrate that this figure is subject to wildly irrational variation." *Zacharopoulos v. Saul*, —F. Supp. 3d—, 2021 WL 235630, at *9 (E.D.N.Y. 2021) (collecting cases). Ultimately, however, Judge Brown would not remand based on the "flawed" testimony because—citing a Seventh Circuit case—the claimant never challenged the testimony before the ALJ. *Id.* at *10 (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion . . . . If the basis of the vocational expert's conclusions *is* questioned at the hearing, however, then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable.").

What is more, Jones contends that the description for another position that the vocational expert said she could still perform—"inspector"—contradicts her residual functional capacity. The

---

[2] To Jones's point that "there is no authority stating that 76,000 jobs in the entire United States, or less, constitutes a significant number," (Jones's Brief at 15), she is incorrect: The Seventh Circuit has held that 1,400 positions is enough. *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 positions enough); *Barker v. Sec. of Health & Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 positions enough); *Trimiar v. Sullivan*, 966 F.2d 1326, 1330–32 (10th Cir. 1992) (850–1,000 position enough); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 positions enough); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 positions enough); *Nix v. Sullivan*, 744 F. Supp. 855, 863 (N.D. Ill. 1990) (675 positions enough), *aff'd*, 963 F.2d 575 (7th Cir. 1991)).

[3] *Available at* https://occupationalinfo.org/24/249587018.html.

ALJ asked the vocational expert to testify about positions available to someone that had to "[a]void concentrated exposure to danger[ous] workplace hazards such as exposed moving machinery," among other things. (Hearing Tr. at 26). The vocational expert said that "inspector" was one such position, even though they "[e]xamine[] squares (tiles) of felt-based linoleum material **passing along on conveyor** and replaces missing and substandard tiles." DOT 739.687-182 (emphasis added).[4]

For all that, the Commissioner argues that *Biestek* is controlling—that the Court must defer to the ALJ: "Essentially, [Jones] would have a rule that it is reversible error anytime a vocational expert fails to furnish all of his or her sources for job data even when [Jones and her attorney] do not ask for such sources." (Commissioner's Brief at 13). But Jones is *not* asking the Court to create such a categorical bar. Instead, she is asking this Court to do exactly as instructed in *Biestek*: Examine the vocational expert testimony and the administrative record to determine whether *here* the ALJ's Step 5 determination turned on substantial evidence.

At any rate, despite the apparent inconsistencies with the vocational expert's testimony, the Court must still defer to the ALJ because Jones never objected to the testimony during the hearing. *See, e.g.*, *Linskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) ("[S]he forfeited this argument by failing to object to the [vocational expert's] testimony during the hearing."); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) ("[B]ecause Barrett's lawyer did not question the basis for the vocational expert's testimony, purely conclusional though that testimony was, any objection to it is forfeited."); *Donahue*, 279 F.3d at 447 ("Raising a discrepancy only after the hearing . . . is too late.").

---

[4] *Available at* https://occupationalinfo.org/73/739687182.html.

— 18 —

### III.       CONCLUSION

The Court **AFFIRMS** the Commissioner of Social Security's benefits decision.

**IT IS SO ORDERED.**

Dated: Tuesday, February 9, 2021

**S/J. Phil Gilbert**
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**
